J-S03030-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE: C.M.C., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: C.L.C. | |
| | No. 1460 WDA 2016 |

Appeal from the Order Entered August 29, 2016
In the Court of Common Pleas of Blair County
Orphans' Court at No(s): 2015 AD 32

BEFORE:    OLSON, J., SOLANO, J., and STRASSBURGER, J.[*]

MEMORANDUM BY SOLANO, J.:                    **FILED MARCH 06, 2017**

Appellant C.L.C. ("Mother") appeals from the order granting the petition of the Blair County Children, Youth, and Families ("BCCYF") agency to involuntarily terminate her parental rights to C.M.C., born March of 2009, ("Child"). This case returns to us after we vacated the decree voluntarily terminating Mother's parental rights and remanded "with instructions to proceed on the involuntary termination petition or for Mother to file a proper voluntary petition under Subchapter A of the Adoption Act." *In re C.M.C.*, 140 A.3d 699, 711 (Pa. Super. 2016) ("*C.M.C. I*"). We affirm.

We state the facts and procedural history set forth by this Court in *C.M.C. I*:

_____

[*] Retired Senior Judge assigned to the Superior Court.

Mother resides in Altoona, Pennsylvania. After a special relief hearing, on May 25, 2010, the court ordered that G.C., Child's maternal grandfather ("Maternal Grandfather"), have legal and physical custody of Child. On July 29, 2014, [BCCYF] received a phone call alleging that Maternal Grandfather was neglecting Child; it implemented BCCYF services for the family that same day. On August 7, 2014, BCCYF obtained an emergency protective custody order, which directed BCCYF would have legal and physical custody, removed Child from Maternal Grandfather's home, and placed Child in foster care.

On October 3, 2014, the trial court adjudicated Child dependent under Section 6302 of the Juvenile Act, removed Child from Maternal Grandfather's home, directed that BCCYF have legal and physical custody, and stated Child's placement would remain in foster care. On December 24, 2014, the trial court entered a four-month permanency review order maintaining BCCYF's legal and physical custody of Child and his placement with his foster parents. On February 2, 2015, the trial court entered a permanency order that changed Child's permanency goal to adoption and maintained his placement with his foster parents. Subsequently, on June 10, 2015, the trial court modified Child's placement from foster care home to the home of Paternal Grandmother in Alabama. [Mother has not seen the Child since June 3, 2015.]

On July 31, 2015, BCCYF filed a petition for **involuntary** termination of the parental rights of Mother and Father pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (8), and (b). On August 18, 2015, the trial court held a joint twelve-month permanency review hearing and hearing on the involuntary termination petition. At the commencement of the hearing, Father and Maternal Grandfather were present in the courtroom and Paternal Grandmother was present via telephone, but Mother was not present. . . .

. . . Subsequently, Mother's counsel, in Mother's absence, stipulated to some of the facts averred in the involuntary termination petition, specifically the names, dates, and ages of the individuals, but did not stipulate to the remainder.

- 2 -

BCCYF first presented the testimony of Krista Gorman, who is employed by Kids First in the New Steps Program in Altoona, Pennsylvania. Ms. Gorman testified about Mother's interaction with reunification services and the visits between Mother and Child [that occurred prior to February 2015]. Ms. Gorman testified that she would support BCCYF's petition to involuntarily terminate Mother's parental rights.

Next, BCCYF questioned Rachel Steinbugl, a BCCYF caseworker assigned to Child beginning in June of 2015. Ms. Steinbugl testified as to the involvement of BCCYF with Child and his parents. During Ms. Steinbugl's testimony, at 9:50 a.m., Mother arrived in the courtroom, and the trial court granted a brief recess for her to speak with her legal counsel. When the court resumed proceedings on the record, counsel for BCCYF stated that Mother was willing to **voluntarily relinquish** her parental rights.

On the record, Mother's counsel and the trial court asked Paternal Grandmother if she adopted Child, would she allow Mother two telephone calls per week with Child and mutually agreed-upon visitation. Paternal Grandmother agreed to the requested telephone calls and visitation.

Mother's counsel then conducted a colloquy of Mother regarding her decision to voluntarily relinquish her parental rights . . . . [Mother stated that termination of her parental rights was best for Child, as she was struggling herself and Child was progressing with Paternal Grandmother.]

The trial court then continued on to the permanency review portion of the proceeding. The [guardian *ad litem*] stipulated that if called to testify, the BCCYF witnesses would testify consistent with the contents of the twelve-month permanency review petition, without admitting to the veracity of the facts set forth in the petition. Counsel for BCCYF presented the testimony of Paternal Grandmother regarding Child's status in her home in Alabama, where he resides. Paternal Grandmother testified that Child was doing well in her home. She stated she

intends to adopt Child, and the adoption proceedings would take place in Blair County, Pennsylvania.

*C.M.C. I*, 140 A.3d at 701-03 (second emphasis added and citations and footnote omitted). The trial court entered a decree voluntarily terminating Mother's parental rights.

This Court vacated the decree because Mother failed to file a written petition voluntarily relinquishing her parental rights, the trial court denied Mother the statutory ten-day period to deliberate on her decision to voluntarily terminate her parental rights, and Mother did not waive the ten-day period. *C.M.C. I*, 140 A.3d at 710. As noted above, this Court instructed that on remand Mother could file a petition for voluntary termination and, if she did not do so, the trial court was to proceed on BCCYF's petition to involuntarily terminate Mother's parental rights.

On remand, the trial court proceeded on BCCYF's petition to terminate Mother's parental rights involuntarily. The court held a hearing on August 25, 2016, at which the parties agreed to incorporate by reference the testimony of Ms. Gorman, who testified at the August 18, 2015 permanency review hearing.

Ms. Gorman, a reunification worker, testified that she observed weekly visits between Mother and Child from December 2014 through February 2015. According to Ms. Gorman, at the visits, Mother would be "very stressed" if Child did not obey her instructions, would inappropriately place Child in "timeout" if he was upset or crying, and did not act in a "loving"

manner to Child. N.T., 8/18/15, at 10. Mother was "very resistant" to BCCYF's attempts to teach Mother how to interact with Child appropriately, and, in Ms. Gorman's view, did not improve. *Id.* Indeed, Ms. Gorman noted that Mother would cancel or end her visits with Child early on multiple occasions. Mother also declined to attend group and one-on-one parenting classes. *Id.* at 13. Mother eventually requested that BCCYF stop providing reunification services in February 2015 because she believed that adoption was an appropriate goal.

At the August 2016 hearing, Ms. Steinbugl testified that since Child moved to Alabama in June of 2015, Mother has not addressed BCCYF's concerns about Mother's parenting skills, specifically Mother's lack of "age appropriate expectations" for Child. N.T., 8/25/16, at 16, 25. After the trial court removed Child from Maternal Grandfather in October 2014,[1] BCCYF began helping Mother in November of 2014 to reunify with Child. Ms. Steinbugl, like Ms. Gorman, testified that Mother asked BCCYF to stop

_____

[1] Mother testified that from 2010 to 2014, Maternal Grandfather had custody of Child and would deny her permission to visit. N.T., 8/25/16, at 39-40, 46. Mother testified, however, that she filed for custody of Child in 2011 or 2012. *Id.* at 50. She said she successfully obtained custody without appearing in court, but that Maternal Grandfather recovered custody of Child because Mother was in an abusive relationship. *Id.* at 49. The complete record was not transmitted to this Court and we therefore are unable to ascertain whether Mother ever had custody of Child. The record does show that in 2014, Mother pleaded guilty of falsely reporting to the police that an ex-boyfriend abused Child and served a sentence of six months' imprisonment. *Id.* at 52.

providing services in February of 2015, as Mother believed that adoption—and not reunification—was an appropriate goal. Mother stated she was under a great deal of stress and that the medicine she was taking for her depression, post-traumatic stress disorder, panic attacks, mood swings, and bipolar disorder was not helping her. *Id.* at 45. Ms. Steinbugl did not know if Mother participated in any other programs to improve her parenting skills.

Based upon Mother's representation that adoption was best for Child, BCCYF arranged for once-weekly visits between Mother and Child,[2] until the court held a hearing finalizing Child's adoption and placement with Paternal Grandmother in Alabama. However, as she had done with respect to the reunification visits, Mother began rescheduling, cancelling, or prematurely terminating the visits. At Mother's request, BCCYF then switched the visitation schedule to once every other week. N.T., 8/25/16, at 19-20. The last visit occurred on June 3, 2015, and was designated a "closure visit."[3] A few days later, Child moved to reside with his Paternal Grandmother in Alabama, and Child has not seen Mother since.

Ms. Steinbugl stated that Mother informed BCCYF that she obtained her own apartment on June 1, 2015 (shortly before Mother's last visit with

---

[2] These visits were different than the reunification visits that occurred between December 2014 and February 2015.

[3] At a "closure visit," the child is informed that this is the last, foreseeable visit with the parent.

Child), but BCCYF was unable to verify this information. N.T., 8/25/16, at 32, 34.[4] Mother testified that she stayed at that apartment until February 1, 2016, at which time she moved to a different, larger apartment in the same complex with her fiancé. Ms. Steinbugl testified that BCCYF prefers to see a parent reside at one address for an extended period of time before concluding that the parent has "stable housing." *Id.* at 34. Other than housing, Ms. Steinbugl stated that Mother had not addressed any of the conditions that led to Child being removed from her care. *Id.* at 25.

Ms. Steinbugl testified that after removing Child from Maternal Grandfather's care, Child had "poor speech and social peer interaction skills." N.T., 8/25/16, at 22. She said Child had issues with "aggression[,] communication and identifying safety."[5] *Id.* Subsequently, Child improved in all of these areas. He no longer needs speech and language therapy, but continues to receive other individual therapy. *Id.* at 23. Child is thriving, according to Ms. Steinbugl, and has strongly bonded with and is very affectionate towards Paternal Grandmother. *Id.* at 24.

Mother testified that she would like one more chance to prove she can be a parent. N.T., 8/25/16, at 43. Noting that Child has never been in her care, Mother expressed her belief that Child, who was six years old at the

_____

[4] The record does not explain the reasons for BCCYF's inability to verify.

[5] The parties did not clarify Ms. Steinbugl's testimony regarding "identifying safety."

time of the hearing, could tell her if he wanted to live with her or not. *Id.*[6] Mother stated that if Child expressed a wish to live with Paternal Grandmother, she would respect that wish. In response to the court's question asking Mother if she was putting Child in a difficult position by deciding whether to stay with Mother or Paternal Grandmother, Mother said she could not answer the question. *Id.* at 44. Mother acknowledged Child's speech has improved but would not say Child was thriving in Alabama because she has not witnessed that result personally. *Id.* at 48. At the conclusion of the hearing, the court terminated Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), and 8, and 2511(b).

Mother timely appealed and filed a Pa.R.A.P. 1925(b) statement. Mother raises the following issue:

> Whether the trial court erred and/or abused its discretion in terminating Mother's parental rights.

Mother's Brief at 4.

We consider Mother's issue in light of our established standard of review.

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only

---

[6] Mother's testimony that she has never cared for Child raises doubt about her assertion that she briefly had custody of him. *See* n.1, *supra*.

upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S. §§ 2101–2938, which requires a bifurcated analysis.

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted). The burden is on the petitioner seeking termination to prove by clear and convincing evidence that the asserted statutory grounds for seeking the termination of parental rights are met. *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009).

We will affirm if we agree with the trial court's decision as to any one subsection of 23 Pa.C.S. § 2511(a), and its decision as to Section 2511(b). *In re B.L.W.,* 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*), **appeal denied**, 863 A.2d 1141 (Pa. 2004); **see In re N.A.M.**, 33 A.3d 95, 100 (Pa. Super. 2011). Here, we affirm the trial court's decision to terminate Mother's parental rights under subsections 2511(a)(8) and (b), which provide:

> **(a) General rule.—**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds: . . .
>
> (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.
>
> \* \* \*
>
> **(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

- 10 -

23 Pa.C.S. § 2511(a)(8), (b).[7]

"[T]ermination under subsection (a)(8) 'does not require an evaluation of [the parent's] willingness or ability to remedy the conditions that led to placement of the children.' Instead, subsection (a)(8) 'requires only that the conditions continue to exist' after the twelve month period has elapsed." *In re R.K.Y.*, 72 A.3d 669, 679-80 (Pa. Super. 2013) (citation omitted). On appeal, Mother, referencing Section 2511(a)(8), argues that she has severed all ties with her father and thus would like the opportunity to know Child. Mother stated that if Child was happy living with his paternal grandmother, then Mother would permit Child to stay with Paternal Grandmother. We conclude that Mother is not entitled to relief.

Child has been living in Alabama since June 2015, which is when Mother last saw him. Although Mother obtained independent housing, Mother has not established that she has taken any steps to improve her parental skills in the twelve months after Child's placement. Mother's assertion that she has severed ties with her father and her request for "one last chance" does not address BCCYF's evidence that the conditions that led to Child's placement in Alabama have continued to exist after June 2016. *See M.T.*, 101 A.3d at 1179. Indeed, Mother was unreceptive to BCCYF's instructions

---

[7] Mother also challenges the sufficiency of evidence with respect to termination under Section 2511(a)(1) and (a)(2). Because we affirm the trial court's decision under subsection (a)(8), we need not address her other subsection (a) arguments. *See B.L.W.*, 843 A.2d at 384.

and efforts to improve her parenting skills, and she reduced the frequency and duration of her visits with Child — opportunities for correcting the skill deficiencies that led to Child's placement with Paternal Grandmother. Further, Child is thriving: while in Alabama, he has bonded with Paternal Grandmother and has improved his speech and ability to interact with his friends and family. Child's placement in Alabama has afforded him much needed stability, and accordingly, termination would serve Child's needs and welfare. We therefore conclude that the trial court did not err in holding that BCCYF met its burden of proving the requirements under Section 2511(a)(8).

With respect to Section 2511(b), this Court has explained that, "[i]ntangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005) (citation omitted), *appeal denied*, 897 A.2d 1183 (Pa. 2006). The trial court must "discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." *Id.* (citation omitted).

Instantly, Mother broadly claims that insufficient evidence exists to terminate under Section 2511(b). She concedes that she has not been involved in Child's life, but says she has wanted an opportunity to parent Child. Mother's Brief at 11. Mother's argument under Section 2511(b) is substantially similar to her argument under Section 2511(a), which we have

rejected above. The trial court did not abuse its discretion in holding that Mother's request for "one last chance" comes too late. Having discerned no abuse of discretion or error of law, we affirm. *See **T.S.M.***, 71 A.3d at 267.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/6/2017